504 P.2d 1299

**Eileen BURNSIDE, Appellant,**

v.

**Roy H. RUNSTETLER and Dorothy Runstetler Nesser, Appellees.**

**No. 1 CA-CIV 1725.**

Court of Appeals of Arizona, Division 1, Department B.

Jan. 16, 1973.

Head & Toci, P. C., Prescott, by Philip E. Toci, for appellant.

H. K. Wilhelmsen, Prescott, for appellee, Dorothy Runstetler Nesser.

EUBANK, Presiding Judge.

This appeal involves a collateral attack against a portion of a Texas default divorce decree, rendered without personal jurisdiction over the husband who was in Oregon at the time, which awarded the wife a divorce, custody of the children and the entire interest in two Arizona based escrows involving the sale of land, which land was admittedly community property.

The appellant, who is the sister of the former husband, Roy H. Runstetler, filed this action in the trial court as assignee of all her brother's interest in Transamerica Title Insurance Company's Escrow No. 1087–024 and Valley National Bank of Arizona Escrow No. 278 (Winslow Branch), against the two escrow companies, her brother's former wife Dorothy Nesser, and her brother. The action does not contest the validity of the divorce portion of the Texas decree, but does allege in Count I "That said court [Texas], without jurisdiction, wrongfully awarded and disposed of properties located in Arizona and belonging to defendant Roy H. Runstetler without obtaining personal service or jurisdiction over his person. That said decree, insofar as it affected the ownership of property belonging to Roy H. Runstetler, which property was located outside the State of Texas and in the State of Arizona, was void to that extent." Count II alleges that the appellant loaned her brother and sister-in-law, Roy and Dorothy, a sum of money of which $2,200, together with five per cent interest per annum, was due and owing appellant since 1964. The validity of Count II was stipulated to by the parties and the judgment made the sum requested payable to appellant from the Valley National Bank Escrow No. 278 (Winslow Branch). There is no appeal from this part of the judgment.

Following a trial on Count I, the court, sitting without a jury, entered judgment in favor of the former wife Dorothy on the basis that, ". . . both parties changed their positions on the basis of the Texas decree and the plaintiff [appellant] is now estopped to collaterally attack the Texas decree . . . ." This appeal is from this part of the judgment.

The appellant raises four questions on appeal. The first questions the validity of the Texas default divorce decree because of the court's lack of personal jurisdiction over the husband, and questions Texas' in rem jurisdiction over the Arizona community property; the second questions whether a divisible divorce decree can be valid as to the divorce and invalid as to its attempt to deal with property rights outside of the jurisdiction of the court; the third questions whether one who relies on a default divorce and remarries is not estopped from contesting the validity of the divorce decree; and the fourth questions whether the agreement of the former husband to give the Arizona community property to his first wife in consideration of her obtaining the Texas divorce is enforceable in Arizona. For the most part these questions miss the central question which in our view is whether the doctrine of quasi or equitable estoppel can properly be applied to the facts of the case at bar. If it can, and if the record supports the judgment then we must affirm; if it can't, we must reverse. It is our opinion that the doctrine ·was improperly applied to the facts of this case and we reverse the judgment of the trial court.

■ Appellant's brief contains an excellent analysis of the law, relating to the nature of the divisible divorce decree, that has evolved under the requirements of the full faith and credit clause of the United States Constitution Art. IV, Sec. 1, citing the historic case of Estin v. Estin, 334 U.S. 541, 68 S.Ct. 1213, 92 L.Ed. 1561 (1948) and our own White v. White, 83 Ariz. 305, 320 P.2d 702 (1958) among others. The appellees do not dispute appellant's analy-

sis. They merely contend that estoppel is proper under the facts of this case. In Arizona our Supreme Court has resorted to estoppel in divorce cases where an inequity would result to one of the parties to a divorce if the decree were set aside. In Green v. Green, 77 Ariz. 219, 269 P.2d 718 (1954) involving an Arizona judgment and a misrepresentation of residency, the court applied estoppel as a wrong-rectifying device, saying:

". . . Under certain circumstances, however, the parties may be estopped to question the validity of a judgment for lack of jurisdiction. As applied to a divorce decree, the general rule is that if one's conduct has led to the obtaining of the decree, or if his conduct for any other reason has been such as would make it inequitable to allow him to deny the validity of the decree, the courts will not listen to his pleas of invalidity. Restatement of the Law, 1948 Supplement, Conflict of Laws, section 112, comment (c). Under such circumstances, equity closes the door and refuses to disturb the situation thus created. This is not the equivalent of allowing parties to confer jurisdiction by consent; it is merely saying the court refuses to grant relief to a guilty party. We recognized these principles in the recent case of Brandt v. Brandt, 76 Ariz. 154, 261 P.2d 978. . . ." (77 Ariz. at 221–222, 269 P.2d at 720).

In Unruh v. Industrial Commission, 81 Ariz. 118, 301 P.2d 1029 (1956) involving a "mail-order divorce" in which the "Mexican court did not have the slightest semblance of jurisdiction to adjudicate the marital status of the parties" our Supreme Court upheld the Mexican decree on the basis of quasi or equitable estoppel stating:

"There are certain principles recognized which are somewhat analogous to estoppel and which are sometimes described as a quasi estoppel. There the conscience of the court is repelled by the assertion of rights inconsistent with a litigant's past conduct. In actions simi-

lar to this it has been formulated into a positive rule:

'The validity of a divorce decree cannot be questioned in a proceeding concerning any right or other interest arising out of the marital relation, either by a spouse who has obtained such decree of divorce from a court which had no jurisdiction, or by a spouse who takes advantage of such decree by remarrying.' Restatement of the Law, Conflict of Laws, Section 112.

"Petitioner invoked the jurisdiction of the courts of Mexico in securing a divorce and then took advantage of such divorce by remarrying. Having done so, she will not now be heard to question the validity of the Mexican divorce for her own personal financial advantage. . . ." [citations omitted] (81 Ariz. at 120–121, 301 P.2d at 1031).

See also Bartholomew v. Superior Court, 4 Ariz.App. 50, 417 P.2d 563 (1966) 31 C.J. S. Estoppel § 63, pp. 392–394 (1964).

Turning to the facts in the case at bar we first note that the trial court was not requested to make findings of fact and conclusions of law, consequently, all inferences that can be drawn from the evidence in favor of sustaining the judgment of estoppel must be drawn by this Court. Cheatham v. Vanderwey, 18 Ariz.App. 35, 409 P.2d 986 (1972); Kay v. Biggs, 13 Ariz. App. 172, 475 P.2d 1 (1970). In addition, Dorothy Nesser's testimony in support of estoppel was completely uncontradicted, except in one instance (Interrogatory 17) which, of course, goes to the weight of such evidence and was obviously resolved in her favor by the trial court since she was awarded judgment.

The record shows that Dorothy and Roy Runstetler were married at Hot Springs, Arkansas, in October of 1945 and that they had two children, Elizabeth and Walter, who were both minors at the time of the divorce. They had a good marriage and resided in several states including Arizona during the marriage. Dorothy testified that they lived in Arizona on two separate occasions between 1954 and 1965, during which time they acquired two parcels of real property which are involved in the two separate escrow sales, referred to above, and which were community property. This real property was acquired by them, in part, by a cash loan from Eileen Burnside, appellant, which is the subject of Count II of the complaint. On April 11, 1965, the family moved to Dumas, Texas, where they lived together until April, 1966. In April Roy obtained a better paying job in Oregon. He left the family in Texas and went to Grants Pass, Oregon. The family was to remain in Texas until school ended and the daughter's wedding occurred on June 5. One week before the school term ended Roy wrote Dorothy indicating that he desired a divorce. This apparently was the first intimation Dorothy had that their marriage was in trouble. She testified:

"A Well, I called him and I said, 'The children were little and Walter was little and he needed his mother, but now he is at the age where he needs his father and if you don't love me why won't you stay with us for his sake.' He said, 'All right, come up for a few weeks and we will try it for his sake.' And I waited until my daughter graduated, and it was June 5th, on a Sunday, and Walter and I went on a Tuesday and it took us five days to get there; we almost had a wreck, but we made it; I got there at 6:00 o'clock on Saturday, June 11th, 1966, and I was met at the door by this woman who refused me entrance.

"Q Now, when you arrived, you are referring now to when you arrived in Oregon?

"A Grants Pass, Oregon.

"Q And you went to your husband's house in Oregon, at Grants Pass?

"A Yes.

"Q And what transpired when you arrived at that address?

"A Another woman met me at the door and refused me entrance. And she

said, 'I have Roy and you don't.' And I said, 'I love him, but if he wants a divorce I will go back to Texas."

Later, the record shows that conversations were had between the couple concerning their marriage. One such reported conversation was as follows:

"Q And would you please advise us or tell us what your husband told you in regard to your marital relationship at that time?

"A Well, it came up about how I was to get back home and everything. And he says, well he feels so bad and he wants a divorce to marry her. And he says, 'If you go back I will give you the escrows and that would be enough to support Walter on.' And he said he didn't want a reconciliation, and I give [sic] up and went back."

This conversation was not denied by Roy. As a result of the situation and a lack of funds, Dorothy consulted an attorney in Grants Pass who filed a separate maintenance action on her behalf on June 20, 1966. The record shows the personal appearance of both parties before the Oregon court and its order awarding $100 per month maintenance to Dorothy and $75 per month support of their son Walter. Thereafter Dorothy returned to Dumas, Texas, with Walter.

A short time thereafter, Roy's attorney in Grants Pass telephoned Dorothy in Dumas, and requested that she obtain a divorce from Roy in Texas, and accept the Arizona escrows in settlement. Due primarily to financial need that required her to work as a waitress, she assented. Dorothy contacted an attorney who, in October, filed a petition for divorce in her behalf in Texas. Roy was personally served in Oregon with copies of the Texas divorce pleadings on October 24, 1966. The record shows that prior to the divorce being filed in Texas, Roy and his attorney were attempting by correspondence to have all payments of the Valley National Bank escrow paid by the bank directly to his attorney in Grants Pass. One such letter written by Roy to Valley National Bank, just four days after he was served with the pleadings in the Texas divorce suit, did not mention the divorce. Roy did not physically appear in Texas and on December 29, 1966, the court entered a default decree awarding Dorothy the divorce, custody of Walter, alimony, child support, and the proceeds of the two Arizona escrows.

On March 5, 1967, Dorothy married Mr. Nesser, whom she had met following her divorce, and on May 3 Roy filed his motion in the Oregon court to vacate the Oregon separate maintenance and support order on the basis of the Texas default divorce and Dorothy's subsequent remarriage. This motion was granted by the Oregon court on May 31, 1967.

Assuming the lack of *in personam* jurisdiction over Roy in the Texas default divorce and the facts of this case, does Arizona law preclude the trial court from giving the Texas judgment effect on the basis of the Unruh rule of "quasi estoppel" or equitable estoppel? In our opinion it does. The judgment states that both parties "changed their positions on the basis of the Texas decree", while the evidence shows that Dorothy's position was changed prior to the Texas decree, and not afterwards. The evidence points to an oral contract between the parties to divide their community property, similarly to that approved by our Supreme Court In re Estate of Harber, 104 Ariz. 79, 87, 449 P.2d 7 (1969), and not to the doctrine of equitable estoppel.

Judgment is reversed.

DONOFRIO, J., concurs.

HAIRE, J., concurs in the result.